# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **LORA J. HURD,** | ) | |
|     Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 2:09cv00071 |
| | ) | **REPORT AND** |
| | ) | **RECOMMENDATION** |
| **MICHAEL J. ASTRUE,** | ) | |
|  Commissioner of Social Security, | ) | By:   PAMELA MEADE SARGENT |
|     Defendant. | ) | UNITED STATES MAGISTRATE JUDGE |

*I. Background and Standard of Review*

The plaintiff, Lora J. Hurd, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying plaintiff's claim for disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 423 (West 2003 & Supp. 2010). Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). As directed by the order of referral, the undersigned now submits the following report and recommended disposition.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance."

*Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Hurd filed her application for DIB on January 12, 2007, alleging disability as of November 18, 2005, based on depression, fibromyalgia, tendonitis, social anxiety, migraine headaches, chronic fatigue, joint stiffness and soreness, anger and shoulder pain and soreness. (Record, ("R."), at 75-77, 103.) The claim was denied initially and upon reconsideration. (R. at 41-43, 48, 49-51, 53-55.) Hurd then requested a hearing before an administrative law judge, ("ALJ"). (R. at 56.) The ALJ held a hearing on July 17, 2008, at which Hurd was represented by counsel. (R. at 17-38.)

By decision dated August 4, 2008, the ALJ denied Hurd's claim. (R. at 7-16.) The ALJ found that Hurd met the nondisability insured status requirements of the Act for DIB purposes through December 31, 2010. (R. at 9.) The ALJ also found that Hurd had not engaged in substantial gainful activity since November 18, 2005. (R. at 9.) The ALJ found that the medical evidence established that Hurd suffered from severe impairments, namely multiple myalgias and shoulder pain/tendonitis, depression and anxiety, but she found that Hurd did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 9.) The ALJ also found that Hurd had the residual functional

capacity to perform simple, repetitive, unskilled, light work[1] that did not require more than occasional interaction with the general public. (R. at 11.) The ALJ found that Hurd could occasionally kneel, stoop and reach, but never climb ladders, ropes or scaffolds, crawl and work around hazards at unprotected heights or on vibrating surfaces. (R. at 11.) The ALJ found that Hurd was unable to perform any of her past relevant work. (R. at 14.) Based on Hurd's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that jobs existed in significant numbers in the national economy that Hurd could perform, including jobs as a clerical worker, a product inspector and a laundry worker. (R. at 14-15.) Thus, the ALJ found that Hurd was not under a disability as defined under the Act and was not eligible for benefits. (R. at 16.) *See* 20 C.F.R. § 404.1520(g) (2010).

After the ALJ issued her decision, Hurd pursued her administrative appeals, but the Appeals Council denied her request for review. (R. at 1-3.) Hurd then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 404.981 (2010). This case is before the court on Hurd's motion for summary judgment filed April 23, 2010, and on the Commissioner's motion for summary judgment filed May 21, 2010.

---

[1] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If an individual can do light work, she also can do sedentary work. *See* 20 C.F.R. § 404.1567(b) (2010).

## II. Facts

Hurd was born in 1964, (R. at 21, 75), which classifies her as a "younger person" under 20 C.F.R. § 404.1563(c). She has a high school education and vocational training in cosmetology. (R. at 21, 109.) Hurd has past relevant work experience as a quality control specialist. (R. at 34.) Hurd testified that she had been in counseling for her symptoms of depression since 2005. (R. at 25-26.) She stated that she took a medical leave of absence from work for six weeks due to her depression. (R. at 27.) Hurd stated that she could stand and/or sit for up to 20 minutes without interruption. (R. at 27-28.)

Leah Perry Salyers, a vocational expert, also was present and testified at Hurd's hearing. (R. at 34-37.) Salyers classified Hurd's past work as a quality control specialist as light and skilled. (R. at 34.) However, she noted that Hurd's description of quality control specialist, as she performed the job, would classify it as medium[2] and skilled. (R. at 34.) Salyers was asked to assume a hypothetical individual of Hurd's age, education and work history who could perform simple, repetitive, unskilled, light work that required no more than occasional stooping, kneeling and reaching and interaction with the general public and who could not crawl, climb ladders, ropes and scaffolds or work around hazardous machinery and unprotected heights. (R. at 35-36.) Salyers stated that a significant number of jobs existed that such an individual could perform, including jobs as a clerical worker, a product inspector and a laundry worker. (R. at 36.)

---

[2]Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of items weighing up to 25 pounds. If an individual can do medium work, she also can do sedentary and light work. *See* 20 C.F.R. § 404.1567(c) (2010).

In rendering her decision, the ALJ reviewed records from Dr. Kevin Blackwell, D.O.; Dr. Robert McGuffin, M.D., a state agency physician; Howard S. Leizer, Ph.D., a state agency psychologist; E. Hugh Tenison, Ph.D., a state agency psychologist; Dr. Joseph Duckwall, M.D., a state agency physician; B. Wayne Lanthorn, Ph.D., a licensed clinical psychologist; Gary T. Bennett, Ph.D., a licensed clinical psychologist; Robert S. Spangler, Ed.D., a licensed psychologist; Stone Mountain Health Services; Lee Regional Medical Center; Dr. James A. Bell, M.D.; Arthritis Associates; Norton Community Hospital; Jonesville Rural Health Clinic; G. Elaine Hamilton, F.N.P., a family nurse practitioner; Haynes Chiropractic Office; and Lee County Behavioral Health Services.

The record shows that Hurd was treated by Dr. James A. Bell, M.D., from 1990 through 1993 for anxiety and depression. (R. at 206-37.) During this time period, Hurd reported that her symptoms improved with medication and that her symptoms had completely resolved. (R. at 211, 224, 226, 237.)

The record shows that Hurd was treated at Stone Mountain Health Services from May 26, 2000, through September 4, 2002, for various complaints including back pain, fatigue, insomnia, depression and ankle pain. (R. at 161-84, 197.) On May 26, 2000, Hurd reported that her symptoms of depression and anxiety were well-controlled with medication. (R. at 182.) On August 31, 2000, Hurd's depression and anxiety were described as "mild." (R. at 180.) On November 28, 2000, Hurd reported that she was caring for her ill mother and that she was having problems with her teenage daughter. (R. at 176.) She was diagnosed with depression and situational stress. (R. at 176.) On February 5, 2001, Hurd complained of depression. (R. at 174.)

She was diagnosed with fatigue, depression and tobacco use/dependence. (R. at 174.) On March 6, 2001, Hurd reported that her symptoms of depression had improved with medication. (R. at 170.) On November 2, 2001, Hurd complained of intermittent right ankle pain and swelling. (R. at 162-63.) She reported that her low back pain had completely resolved. (R. at 162.) Hurd had full range of motion in her neck, and she could raise her arms over her shoulders without limitation. (R. at 162.) She had normal muscle strength in both the upper and lower extremities. (R. at 162.) Hurd had full range of motion of her ankle. (R. at 162.) She was diagnosed with right ankle pain and swelling of uncertain etiology, cervical strain and history of depression and anxiety. (R. at 162.) On September 4, 2002, Hurd reported only intermittent back pain, chronic fatigue and occasional insomnia. (R. at 161.) X-rays of Hurd's lumbar spine were normal. (R. at 161.) She reported that her symptoms of depression had improved with medication. (R. at 161.)

The record shows that Hurd was seen at Jonesville Rural Health Clinic from November 2005 through December 2007, for various complaints including low back pain, leg pain, anxiety, depression, fibromyalgia, shoulder pain and temporal mandibular joint pain. (R. at 286-92, 390.) On June 12, 2008, G. Elaine Hamilton, F.N.P., a family nurse practitioner, indicated that Hurd could occasionally lift and carry items weighing less than 10 pounds. (R. at 423-26.) She indicated that Hurd could stand, walk and/or sit less than two hours in an eight-hour workday. (R. at 423.) She indicated that Hurd could sit, stand and walk up to 20 minutes without interruption. (R. at 424.) Hurd required the opportunity to shift at will from sitting, standing and/or walking. (R. at 424.) She reported that Hurd would need to lie down at unpredictable intervals during a work shift, at least one time per day. (R. at 424.)

She reported that Hurd could occasionally twist, stoop and climb stairs and never crouch and climb ladders. (R. at 424.) Hamilton indicated that Hurd could not reach, handle or push and pull. (R. at 425.) She reported that Hurd should avoid concentrated exposure to temperature extremes, humidity, noise and hazards and should avoid moderate exposure to fumes, odors, dusts, gases and poor ventilation. (R. at 425.) She opined that Hurd would be absent from work more than three times a month due to her impairments. (R. at 426.)

The record shows that Hurd was treated at Lee County Behavioral Health Services from December 2005 through July 2007. (R. at 342-79.) In December 2005, Hurd was diagnosed with an adjustment disorder with mixed anxiety and depressed mood and depressive disorder, not otherwise specified. (R. at 368.) Hurd's then-current Global Assessment of Functioning score, ("GAF"),[3] was assessed at 60, with her highest and lowest GAF scores for the previous six months being 60.[4] (R. at 368.) In August 2006, Hurd reported that she was "doing good." (R. at 353.) She stated that she was planning a trip to the beach with her sisters and that she hoped to eventually find another job. (R. at 353.) In November 2006, Hurd's mood was mildly depressed with congruent affect. (R. at 351.) Options were identified that would assist Hurd with occupying her time, such as crafts or a job that would not be too strenuous. (R. at 351.) In July 2007, Hurd's mood was described as moderately depressed. (R. at 342.)

---

[3]The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994).

[4]A GAF score of 51-60 indicates that the individual has "[m]oderate symptoms ... OR moderate difficulty in social, occupational, or school functioning ...." DSM-IV at 32.

On April 2, 2007, Dr. Kevin Blackwell, D.O., examined Hurd at the request of Disability Determination Services. (R. at 293-97.) Hurd had normal symmetry and strength in her upper and lower extremities. (R. at 295.) Grip strength was normal. (R. at 295.) Fine motor movement skills of the hands were normal. (R. at 295.) X-rays of Hurd's right shoulder, taken on March 16, 2007, showed small granulomas in the right hilum. (R. at 284.) Dr. Blackwell diagnosed chronic bilateral shoulder pain, right worse than left, right arm pain probably secondary to bilateral shoulder pain and history of headaches. (R. at 295.) Dr. Blackwell opined that Hurd should avoid overhead reaching activities to less than one-third of the day. (R. at 295.) He placed no limitations on her ability to stoop or bend and opined that she should limit squatting and kneeling activities to one-third of the day or less. (R. at 295.) He opined that Hurd could not crawl. (R. at 295-96.) Dr. Blackwell opined that Hurd could occasionally lift and carry items weighing up to 50 pounds and frequently lift and carry items weighing up to 20 pounds. (R. at 296.) He found no environmental or communicative limitations, and he opined that she could sit and stand for up to eight hours in an eight-hour workday with hourly postural changes. (R. at 296.)

On March 10, 2008, Dr. Blackwell again examined Hurd at the request of Disability Determination Services. (R. at 407-10.) Dr. Blackwell opined that Hurd could occasionally lift and carry items weighing up to 50 pounds, frequently lift and carry items weighing up to 20 pounds and continuously lift and carry items weighing up to 10 pounds. (R. at 401, 410.) He opined that Hurd could sit for up to eight hours in an eight-hour workday, stand for up to six hours in an eight-hour workday and walk for up to four hours in an eight-hour workday. (R. at 402, 410.) He found that Hurd could sit, stand and/or walk for up to one hour without interruption. (R. at 402.) Dr.

Blackwell opined that Hurd could occasionally reach, climb stairs and ramps, balance, stoop and kneel and never climb ladders or scaffolds, crouch or crawl. (R. at 403-04, 410.) Dr. Blackwell opined that Hurd could not work around unprotected heights and that she could occasionally work around moving mechanical parts, humidity and wetness, dust, odors, fumes and pulmonary irritants, temperature extremes and vibrations. (R. at 405.) He found that Hurd could frequently operate a motor vehicle. (R. at 405.)

On April 10, 2007, Dr. Robert McGuffin, M.D., a state agency physician, indicated that Hurd had the residual functional capacity to perform medium work. (R. at 298-303.) He indicated that Hurd was limited in her ability to push and/or pull with her upper extremities. (R. at 299.) He found that Hurd could frequently balance and occasionally climb, stoop, kneel, crouch and crawl. (R. at 300.) Dr. McGuffin found that Hurd's ability to reach in all directions was limited. (R. at 300.) No visual or communicative limitations were noted. (R. at 300-01.) He indicated that Hurd should avoid moderate exposure to work hazards, such as machinery and heights. (R. at 301.)

On April 10, 2007, Howard S. Leizer, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), indicating that Hurd suffered from a nonsevere affective disorder. (R. at 305-18.) Leizer found that Hurd was mildly restricted in her activities of daily living, in maintaining social functioning and in maintaining concentration, persistence or pace. (R. at 315.) He found that Hurd had not experienced any episodes of decompensation. (R. at 315.)

On July 9, 2007, E. Hugh Tenison, Ph.D., a state agency psychologist,

completed a PRTF indicating that Hurd suffered from a nonsevere affective disorder. (R. at 319-32.) Tenison found that Hurd was mildly restricted in her activities of daily living, in maintaining social functioning and in maintaining concentration, persistence or pace. (R. at 329.) He found that Hurd had not experienced any episodes of decompensation. (R. at 329.)

On July 9, 2007, Dr. Joseph Duckwall, M.D., a state agency physician, indicated that Hurd had the residual functional capacity to perform medium work. (R. at 333-39.) He indicated that Hurd was limited in her ability to push and/or pull with her upper extremities. (R. at 334.) He found that Hurd could frequently balance and occasionally climb, stoop, kneel, crouch and crawl. (R. at 335.) Dr. Duckwall found that Hurd's ability to reach in all directions was limited. (R. at 335.) No visual or communicative limitations were noted. (R. at 335-36.) He indicated that Hurd should avoid moderate exposure to work hazards, such as machinery and heights. (R. at 336.)

On March 10, 2008, B. Wayne Lanthorn, Ph.D., a licensed clinical psychologist, evaluated Hurd at the request of Disability Determination Services. (R. at 391-96.) Lanthorn described Hurd's mood as an agitated depression. (R. at 393.) Hurd reported that she experienced one to two panic attacks per week. (R. at 394.) Lanthorn diagnosed pain disorder associated with both psychological factors and chronic general medical conditions, recurrent, severe, major depressive disorder and an anxiety disorder with both panic attacks and generalized anxiety. (R. at 395.) Lanthorn opined that Hurd had a then-current GAF score of 55. (R. at 395.)

Lanthorn completed a mental assessment indicating that Hurd had a limited, but

satisfactory, ability to understand, remember and carry out complex instructions, to make judgments on complex work-related decisions, to interact appropriately with the public, with supervisors and with co-workers and to respond appropriately to usual work situations and to changes in a routine work setting. (R. at 397-99.) He noted no other limitations.

On April 24, 2008, Gary T. Bennett, Ph.D., a licensed clinical psychologist, reviewed Hurd's records at the request of Disability Determination Services and opined that she suffered from depression, a panic disorder and generalized anxiety disorder. (R. at 411-12.) However, he opined that Hurd did not meet or equal any of the mental disorder listings. (R. at 411-12.)

On May 8, 2008, Robert S. Spangler, Ed.D., a licensed psychologist, evaluated Hurd at the request of Hurd's attorney. (R. at 413-17.) The Wechsler Adult Intelligence Scale-Third Edition, ("WAIS-III"), test was administered, and Hurd obtained a verbal IQ score of 88, a performance IQ score of 81 and a full-scale IQ score of 85. (R. at 416, 418.) However, Spangler considered the performance IQ score and the resulting full-scale IQ score invalid, finding that such scores were under estimates of Hurd's abilities due to erratic concentration and slow pace secondary to discomfort from medical conditions. (R. at 416.) Spangler also administered the Wide Range Achievement Test-Fourth Edition, ("WRAT-4"), which revealed that Hurd had an 11.9 grade level for reading, an 11.5 grade level for sentence comprehension and an 8.7 grade level for arithmetic computation. (R. at 416, 418.) Spangler diagnosed recurrent, moderate major depressive disorder and moderate generalized anxiety disorder. (R. at 417.) He assessed Hurd's then-current GAF score at 55. (R. at 417.)

Spangler completed a mental assessment indicating that Hurd had a limited, but satisfactory, ability to use judgment, to interact with supervisors and to understand, remember and carry out simple instructions. (R. at 420-22.) He found that Hurd had a seriously limited, but not precluded, ability to follow work rules, to relate to co-workers, to deal with the public, to deal with work stresses, to maintain attention and concentration, to understand, remember and carry out complex job instructions, to maintain personal appearance, to behave in an emotionally stable manner and to relate predictably in social situations. (R. at 420-21.) Spangler reported that Hurd had satisfactory to a seriously limited ability to function independently. (R. at 420.) He found that Hurd had no useful ability to understand, remember and carry out complex instructions and to demonstrate reliability. (R. at 421.)

## III. Analysis

The Commissioner uses a five-step process in evaluating DIB claims. *See* 20 C.F.R. § 404.1520 (2010); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. § 404.1520. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 404.1520(a) (2010).

Under this analysis, a claimant has the initial burden of showing that she is

unable to return to her past relevant work because of her impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. § 423(d)(2)(A) (West 2003 & Supp. 2010); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

As stated above, the court's function in the case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. The court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained her findings and her rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

By decision dated August 4, 2008, the ALJ denied Hurd's claim. (R. at 7-16.) The ALJ found that the medical evidence established that Hurd suffered from severe impairments, namely multiple myalgias and shoulder pain/tendonitis, depression and anxiety, but she found that Hurd did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 9.) The ALJ also found that Hurd had the residual functional capacity to perform simple, repetitive, unskilled, light work that did not require more

than occasional interaction with the general public. (R. at 11.) The ALJ found that Hurd could occasionally kneel, stoop and reach, but never climb ladders, ropes or scaffolds, crawl and work around hazards at unprotected heights or on vibrating surfaces. (R. at 11.) The ALJ found that Hurd was unable to perform any of her past relevant work. (R. at 14.) Based on Hurd's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that jobs existed in significant numbers in the national economy that Hurd could perform, including jobs as a clerical worker, a product inspector and a laundry worker. (R. at 14-15.) Thus, the ALJ found that Hurd was not under a disability as defined under the Act and was not eligible for benefits. (R. at 16.) *See* 20 C.F.R. § 404.1520(g).

In her brief, Hurd argues that substantial evidence does not exist to support the ALJ's residual functional capacity finding.(Brief In Support Of Plaintiff's Motion For Summary Judgment, ("Plaintiff's Brief"), at 9-17.) In particular, Hurd argues that the ALJ erred by failing to give appropriate weight to the opinions of Lanthorn and Spangler. (Plaintiff's Brief at 12.) Hurd also argues that the ALJ erred by failing to properly address the opinions of Dr. Blackwell and nurse practitioner Hamilton. (Plaintiff's Brief at 14-16.)

Hurd argues that substantial evidence does not exist to support the ALJ's residual functional capacity finding. (Plaintiff's Brief at 9-17.) The ALJ in this case found that Hurd had the residual functional capacity to perform simple, repetitive, unskilled, light work that did not require more than occasional interaction with the general public. (R. at 11.) The ALJ also found that Hurd could occasionally kneel, stoop and reach, but never climb ladders, ropes or scaffolds, crawl and work around hazards at unprotected heights or on vibrating surfaces. (R. at 11.) Based on my

-14-

review of the record, I find that substantial evidence exists to support this finding. The ALJ noted that Hurd complained of and sought treatment for back and shoulder pain, fatigue and mental impairments in advance of her alleged onset date of November 18, 2005. (R. at 12.) The ALJ noted that the medical evidence did not show a significant worsening of a condition that could be expected to preclude all work-related activities. (R. at 12.) The Fourth Circuit has held that absent a subsequent deterioration of an impairment, a claimant will not be found disabled from a job that she previously performed with the same impairment. *See Craig v. Chater*, 76 F.3d 585, 596 n.7 (4th Cir. 1996) (citing *Cauthen v. Finch*, 426 F.2d 891, 892 (4th Cir. 1970)).

The ALJ noted that she was giving significant weight to the opinion of Dr. Blackwell because it was consistent with the objective medical evidence. (R. at 14.) Dr. Blackwell examined Hurd in April 2007 and March 2008 and opined that Hurd had the residual functional capacity to perform medium work. (R. at 293-97, 407-10.) The state agency physicians also opined that Hurd had the residual functional capacity to perform medium work. (R. at 298-303, 333-39.) While there is ample evidence in the record to support a residual functional capacity for medium work, the ALJ gave Hurd the benefit of the doubt and reduced her residual functional capacity to the light exertional level.

Hurd argues that the ALJ failed to properly address the assessments of Dr. Blackwell and nurse practitioner Hamilton. (Plaintiff's Brief at 14-16.) Based on my review of the record, I find that the ALJ properly addressed both assessments. As noted above, the ALJ gave significant weight to the opinion of Dr. Blackwell, noting that it was consistent with the objective medical evidence. (R. at 14.) The ALJ also

noted Hamilton's assessment and found that it was entitled to little weight because it was not consistent with the medical evidence of record and because it was not completed by an acceptable medical source. (R. at 14.)

Hurd also argues that the ALJ erred by failing to give appropriate weight to the opinions of Lanthorn and Spangler. (Plaintiff's Brief at 12.) The ALJ noted that she had considered the assessments of Lanthorn and Spangler and that she had accepted their opinions insofar as Hurd was moderately limited in her ability to maintain social functioning and to maintain concentration, persistence or pace. (R. at 14.) However, the ALJ noted that Lanthorn's conclusion questioning whether or not Hurd could function in a 40-hour workweek due to the "severity of her ongoing psychopathology" was undermined by his finding that Hurd's GAF score was assessed at 55, indicating only moderate limitations. (R. at 13, 395-96.) The ALJ stated that she was giving these assessments little weight because they were inconsistent with the other evidence of record and the opinions of the state agency psychologists. (R. at 14.)

The record consistently shows that Hurd's symptoms of anxiety and depression improved and completely resolved with medication. (R. at 161, 170, 182, 211, 224, 226, 237, 353.) "If a symptom can be reasonably controlled by medication or treatment, it is not disabling." *Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986). Despite Hurd's allegations of social withdrawal and apprehension, she reported that she was planning a trip to the beach with her sisters. (R. at 353, 373, 395.) Hurd reported in August 2006 that she hoped to eventually find another job. (R. at 353.) Hurd reported that she was able to complete all activities of daily living and independent living with no intervention. (R. at 378.) The state agency psychologists found that Hurd suffered from a nonsevere affective disorder. (R. at 305-32.)

Psychologist Bennett also reviewed Hurd's records and found that Hurd suffered from depression, a panic disorder and a generalized anxiety disorder. (R. at 411-12.) Bennett also found that Hurd's impairments did not meet or equal any of the mental disorder listings. (R. at 411-12.) The ALJ noted that she was giving Hurd the benefit of the doubt by placing more severe restrictions on her work-related abilities. (R. at 13-14.)

Based on the above, I find that substantial evidence exists to support the ALJ's finding with regard to Hurd's residual functional capacity. I also find that the ALJ properly weighed the medical evidence.

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1. Substantial evidence exists to support the ALJ's finding with regard to Hurd's residual functional capacity;

2. Substantial evidence exists to support the ALJ's weighing of the medical evidence; and

3. Substantial evidence exists to support the ALJ's finding that Hurd was not disabled under the Act.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court deny Hurd's motion for summary judgment, grant the Commissioner's motion for summary judgment and affirm the

final decision of the Commissioner denying benefits.

### Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C.A. § 636(b)(1)(C) (West 2006 & Supp. 2010):

> Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time.

DATED: September 16, 2010.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE